**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **No. 5:19-CR-2-RWS-CMC** |
| | § | |
| **KENDALL RAY GRAY** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

The above-entitled and numbered cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following pending motion is before the Court:

**Defendant's Motion to Suppress (Docket Entry # 18).**

The Court, having reviewed the relevant briefing and hearing arguments of counsel April 11, 2019, recommends the motion be **DENIED**.

## I. FACTUAL OVERVIEW

A brief summary of the facts is needed here to put Defendant's motion in context. On or about November 9, 2018, Texarkana, Texas officers were on patrol when they allegedly observed a gray vehicle leave a parking lot and turn into the center lane rather than the nearest available lane. Believing they observed a traffic violation, the officers followed the vehicle but did not activate any lights or sirens. The vehicle drove into a residential area and parked on the side of a public street. The driver exited the vehicle and began to walk away from the vehicle. As the officers activated the lights and approached, the driver ran. An officer ran after the driver, and the driver surrendered to police custody in an alleyway.

The driver, then identified as Defendant Kendall Ray Gray ("Defendant"), was arrested for evading detention and read his *Miranda* rights. Shortly thereafter, it was learned that Defendant had outstanding Class C warrants as well. Defendant was driven to the location where his vehicle was parked. Police removed the keys to the vehicle and began processing the vehicle for impound. Pursuant to an "inventory" search, officers located what was suspected to be marijuana in the driver's side door and two off-white rocks the officers believed to be narcotics. The officers also located a loaded handgun under the driver's seat.

The search was conducted without a warrant. The encounter was captured on video.

## II.  PROCEDURAL BACKGROUND

On or about January 17, 2019, the Eastern District of Texas issued an indictment, charging Defendant of one count Felon in Possession of Firearm or Ammunition in violation of 18 U.S.C. § 922(g)(1). Defendant waived arraignment and pled not guilty on January 23, 2019. The current pretrial conference is set for May 7, 2019 with jury selection and trial scheduled May 28, 2019.

## III.  DEFENDANT'S MOTION TO SUPPRESS

On March 22, 2019, Defendant filed his current motion, seeking to suppress evidence obtained as a result of the search of his vehicle. According to Defendant, the search was illegal for two reasons. First, Defendant asserts the vehicle was lawfully parked and should not have been towed in order to conduct an inventory search. Second, Defendant asserts the search of the vehicle was not in compliance with any written inventory search but rather was a pretext to search for anything that could be incriminating.

In its response, the Government asserts the evidence was discovered during a standard inventory of Defendant's car conducted following his arrest on three outstanding warrants and

2

charges of evading detention. According to the Government, Defendant admits he fled from the police and further concedes he had outstanding Class C warrants. The Government argues these concessions alone dispense with much of Defendant's motion "under the attenuation doctrine." Docket Entry # 21 at 1. According to the Government, video recordings show officers properly inventorying Defendant's car pursuant to department policy and discovering the drugs and weapon.

## IV. APRIL 11, 2019 HEARING

### A. Evidence

The Government attached the following to its response, which the Court admitted into evidence at the April 11 hearing: (1) videos supplied on DVD (Docket Entry #s 21-1 through 21-5)[1]; (2) photos (Docket Entry #s 21-6, 21-8 through 21-13); (3) Texarkana, Texas Police Department General Orders Manual (Docket Entry # 21-7); (4) Inventory (Docket Entry # 21-14); (5) copies of three outstanding warrants (Docket Entry # 21-15); and (6) warning citation (Docket Entry # 21-16). The Court will consider these items part of the record, in addition to the evidence introduced at the suppression hearing. The evidence and testimony reveals as follows.

### B. Officer Joshua Armstrong

Investigator Joshua Armstrong with the Texarkana, Texas Police Department ("Texarkana, Texas PD") testified at the hearing. Tr. at 5:18-24. Officer Armstrong has been with the Texarkana, Texas PD for six and a half years and is currently assigned to the special investigative unit as a "problem-oriented police officer." ("POP"). *Id*. at 5:25-6:7. A large portion of his job is handling narcotics. *Id*. at 6:8-11.

---

[1] Exhibit 1 compiles video clips from police footage. The Government attached each of the underlying videos as the following exhibits: Exhibit 2 [Lewis Dash Cam. Video]; Exhibit 3 [Armstrong Body Cam. Video]; Exhibit 4 [Rear Video]; Exhibit 5 [Weaver Body Cam. Video].

On November 9, 2018, Officer Armstrong was patrolling around Texarkana in a marked police car. He was wearing a uniform and vest marked with "Police" on the front and back. *Id.* at 7:3-22. Officer Armstrong observed a gray Jeep in the driveway of a "narcotics residence that [the POP team] had been watching." *Id.* at 7:23-8:5. Officer Armstrong observed a black male exit the driver's side of the vehicle and walk toward the front door of the house. *Id.* at 8:6-12. Officer Armstrong did not see him exit the house or get back into the vehicle. *Id.* at 8:19-22.

Later, Officer Armstrong was driving down Milam Street and observed the same vehicle. He then observed the same vehicle on 7th Street, which is about four blocks south, and it "made four left-hand turns, making a circle, and then pulled into a parking lot." *Id.* at 8:24-9:9. Officer Armstrong parked down the street and "watched and waited to see if that vehicle left." *Id.* at 9:19-22.

Officer Armstrong observed the vehicle exit the parking lot by making a wide right turn into the center lane, which is an "arrestable offense under Texas law." *Id.* at 11:12-12:2. Officer Armstrong attempted to catch up to the vehicle to initiate a traffic stop, but he did not turn on his lights because of public safety. *Id.* at 12:5-24. Officer Armstrong observed the vehicle turn north on Whitaker Street and then turn left (or west) on 9th Street without signaling a hundred feet prior to the turn. *Id.* at 13:10-16; Ex. 1A (Lewis Dash Cam. at 0:14-2:06). Officer Armstrong waited on several cars to pass through the intersection, and he then turned onto 9th Street. Tr. at 13:25-14:9.

The vehicle drove into a residential area and parked along a public street. Ex. 1A (Lewis Dash Cam. at 0:14-2:06). Officer Armstrong caught up with the vehicle, and after he passed through a stop sign, Officer Armstrong activated the lights on the patrol car. Tr. at 14:12-15:16. Defendant exited the vehicle. *Id.* at 15:18-19. According to Officer Armstrong, the lights were on at that point;

4

Defendant saw the officers and knew they were there; and he started running northbound on the side of a house. *Id*. at 15:19-22. Officer Armstrong stopped the patrol car. *Id.* at 16:19-20.

Officer Jeremy Sutton, who was riding in the passenger seat, ran after Defendant. *Id*. at 16:20-24; Ex. 1B (Armstrong Body Cam. 0:01-4:04). The word "POLICE" was written in big, white letters across Officer Sutton's chest; his badge was strapped to his belt; and a badge emblem on his uniform identified him as a police officer. *Id*. Officer Armstrong drove a "circle around" Defendant, "cutting him off in the front." Tr. at 17:2-6. Officer Armstrong called on the radio for responding officers, letting them know to go to 9th Street and secure the vehicle. *Id.* at 18:1-11.

After leading Officer Sutton into an alleyway, Defendant surrendered to police custody. Ex. 1B (Armstrong Body Cam. 0:01-4:04). He was arrested for evading detention and read his *Miranda* rights. *Id*. Defendant had an Arkansas identification card rather than a driver's license. Tr. at 19:11-20:7. Officer Armstrong called into dispatch to see if Defendant had a valid driver's license and any active warrants for his arrest. *Id*. at 20:15-20. Within minutes of Defendant's arrest, dispatch located three outstanding misdemeanor traffic warrants for Kendall Gray. Ex 1C (Armstrong Body Cam. 6:10-9:12); Ex. 15.

Officer Armstrong transported Defendant half a block to where his vehicle was parked. Tr. at 21:8-12. Defendant was screaming "Call Jimmy Blood. Call Jimmy." *Id.* at 21:13-14. According to Officer Armstrong, Mr. Blood is a known narcotic dealer in Texarkana. *Id*. at 21:20-23.

Officer Kim Weaver, a field training officer, and Officer Dustin Johnson, who was in training at the time, arrived to help impound Defendant's vehicle. *Id*. at 22:3-9. Officer Armstrong called in an impound with Bubba Green's Towing. *Id*. at 25:13-18. Officer Armstrong explained

5

Texarkana has a written policy with respect to impounding a vehicle when the driver of the vehicle is arrested, and the policy is designed to protect the vehicle and any belongings in the vehicle as well as the Texarkana, Texas PD from liability. *Id*. at 23:24-25:5; Ex. 7 (Texarkana, Texas Police Department General Orders Manual at 3).

Defendant "boisterously protested" by yelling, beating a police car, and insisting the officers could not legally search the parked vehicle. Docket Entry # 18 at 2; Ex. 1E (Rear Video, 12:15-13:53). However, pursuant to Texarkana policy, officers began processing Defendant's vehicle for impound incident to arrest.

Upon opening the front driver's door, officers found small bags containing suspected marijuana, methamphetamine, and cocaine in plain view. A loaded handgun with a chambered round was positioned under the driver's side seat. Ex. 1F (Weaver Body Cam. at 16:00-16:20). Officer Armstrong used an electronic ticket writer to impound the vehicle and to create an Inventory Report. Tr. at 26:10-27:13. In addition to making the written record, Officer Armstrong recorded the officers' making the inventory as well. *Id*. at 27:14-20. Defendant was then transported by Texarkana, Texas PD officers. *Id*. at 27:25-28:4.

On cross examination, Officer Armstrong stated he saw Defendant's vehicle parked at a house known as a "narcotics location," but at that point, Officer Armstrong did not have reasonable suspicion or probable cause to arrest or detain Defendant. *Id*. at 33:6-21. However, Officer Armstrong later observed the same vehicle pull out of a parking lot and make a wide right turn. *Id.* at 33:22-34:3. Officer Armstrong was a block or two away when he observed the wide right turn, and it was his intent to stop the vehicle and give the driver a warning or citation. *Id.* at 34:6-13. Officer Armstrong followed the vehicle and made an effort to catch up. *Id.* at 34:20-35:2. Officer

6

Armstrong proceeded through a couple of intersections and then turned left. *Id.* at 35:3-6.

As Officer Armstrong approached, Defendant had parked his vehicle on the side of the road and was exciting the vehicle. There was nothing unlawful about where he parked. *Id.* at 35:7-19. According to Officer Armstrong, he is not sure the lights and sirens were activated at the time Defendant parked the vehicle, but the lights were on at the time Defendant exited the vehicle. *Id.* at 36:14-23. The lights reflect off all kind of different surfaces, even in the daylight. *Id.* at 37:8-38:3.

When asked to view the video of his approach to the parked vehicle, Officer Armstrong did not see the reflection of the lights as he passed a stop sign; at the same time, the video reflects the red brake lights on Defendant's vehicle as it was being stopped. *Id.* at 39:11-25. Officer Armstrong did not see any lights in that particular video reflecting from Defendant's vehicle or the other vehicle parked in front of Defendant's vehicle as the patrol car passed by. *Id.* at 44:3-45:5;46:12-21. At that point, Defendant had run off.[2] *Id.* at 45:7-11. On re-direct, Officer Armstrong stated he agreed with his report, which indicated "the driver exited the vehicle in a fast manner as he saw us approaching him. I activated my emergency lights on top of the patrol car, and the black male immediately began to run." *Id.* at 64:21-65:1. Officer Armstrong arrested Defendant for evading on foot with a prior conviction, and he gave Defendant some warnings for the traffic violations. *Id.* at 47:2-16.

At the hearing, Defendant's counsel focused on when the overhead lights came on and whether it would still be considered a traffic stop if Defendant were already out of the parked vehicle when the lights were activated. *Id.* at 50:3-51:11. Officer Armstrong agreed with Defendant's counsel that a person is not being detained until an officer does something to convey the person is

---

[2] Defendant locked the vehicle and closed the door after exiting. Tr. at 48:5-7.

not free to go or that the officer is attempting to stop the person. *Id.* at 50:8-12. Officer Armstrong agreed that an officer just following a person does not convey the person has to stop. *Id.* at 50:13-15. Officer Armstrong agreed the only way Defendant would have known he had an obligation to stop would have been through the lights on the patrol car. *Id.* at 50:18-51:7.

However, even assuming the patrol car lights were not activated until after Defendant exited the vehicle, Officer Armstrong believed it would still be a traffic stop because Defendant was stopped for a traffic offense that he committed in that vehicle prior to parking. *Id.* at 51:8-24. According to Officer Armstrong, if he pulled up and turned on his lights and Defendant ran, he was evading detention for the traffic violations. *Id.* at 51:25-52:6.

On re-direct, the Government played Officer Armstrong's body cam "to sort out the light issue." *Id.* at 57:22-58:2; Exh. 1B. Officer Armstrong listened for a sound the "toggle switch" made when it was turned on. *Id.* at 58:6-59:11. Officer Armstrong identified the click on the video as follows: Officer Sutton said "484" on the radio; there was a pause waiting on dispatch to get back; immediately after "484" is repeated by dispatch, the lights were turned on. *Id.* at 59:12-62:14. At about the same time, Defendant's door was open and he was out of the car. *Id.* at 62:19-63:15.

Officer Armstrong believed the driver of the vehicle may have been in possession of narcotics and wanted to see if he was in possession of narcotics. *Id.* at 55:23-56:8. However, it would depend on the circumstances of the traffic stop if he would be able to search the vehicle. *Id.* at 56:9-57:6.

**C.    Officer Kimberly Weaver**

Officer Kimberly Weaver also testified at the hearing. She has been with the Texarkana, Texas PD for over sixteen years. *Id.* at 66:5-15. In November 2018, she was patrolling and

responded to a traffic stop called in by Officer Armstrong and Officer Sutton. *Id.* at 66:24-67:12. She was requested to stand by a silver Jeep Grand Cherokee parked on 9th Street. *Id.* at 67:13-68:7. Once she arrived, Officer Weaver was "assigned a responsibility by participating in inventory of the Jeep." *Id.* at 68:8-11. She had assistance from Officer Johnson, who she was training at the time, in conducting the inventory. *Id.* at 72:4-8.

She testified regarding the Texarkana, Texas PD's impounding policy and stated the inventory of Defendant's vehicle was conducted in accordance with the policy. *Id.* at 68:14-24; *see also id.* at 68:25-72:3. When Officer Weaver opened the door to the vehicle, she noticed in the driver's door handle area a clear bag of what she believed to be marijuana; it was "instantly visible." *Id.* at 72:9-13. Even before opening the car door, she suspected she would find drugs because of Defendant's behavior. *Id.* at 72:14-19. Officer Johnson also located a loaded gun under the driver's seat of the vehicle. *Id.* at 73:8-74:3.

According to Officer Weaver, officers preparing an inventory try to look for anything of value or things that need to be placed in safekeeping. *Id.* at 74:11-14. Officer Weaver explained the drugs and firearms were not recorded because they were, in this situation, illegal and were placed in the evidence property room rather than being left in the vehicle. These things were placed on a property report in compliance with the Texarkana, Texas PD's policy. *Id.* at 75:3-21; Ex. 7 (Texarkana, Texas Police Department General Orders Manual at 9, section N7).

On cross examination, Officer Weaver stated there was not much of value to document other than the evidence the officers found and placed into property. Tr. at 76:22-77:6. Officer Weaver agreed the policy provides that officers should inventory the vehicle's interior and exterior and "essentially document all property, personal or otherwise." *Id.* at 77:7-13. When asked if she would

agree that "miscellaneous clothing and paper" adequately describes the contents of Defendant's vehicle, Officer Weaver stated, due to the amount of clothing and things in the vehicle, "it would have been too difficult to list every type of pants and what brand and size and all that stuff, so it was just clothing."[3]  *Id.* at 77:14-21.

## D.    Officer Dustin Johnson

Officer Dustin Johnson also testified at the hearing.  *Id.* at 79:11-21  At the time of the incident, Officer Dustin Johnson had been with the Texarkana, Texas PD for less than six months. He was training with Officer Weaver. *Id.* at 80:7-14.

The Government offered into evidence a USB of Officer Johnson's body cam Defendant's Exhibit 1.  It was admitted without objection.  *Id.* at 81:3-24.

## V.  APPLICABLE LAW

The Fourth Amendment, applicable through the Fourteenth Amendment to the States, guarantees the right to be free from unreasonable searches and seizures.  *Bailey v. United States*, 133 S.Ct. 1031, 1035 (2013).  The Fourth Amendment  "does not proscribe all state-initiated search and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250–251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citing *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)).  Traffic stops are deemed seizures for the purposes of the Fourth Amendment.  *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001).

The reasonableness of traffic stops and investigative detentions of persons suspected of criminal activity is evaluated through a two-step inquiry under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct.

---

[3] Officer Armstrong agreed there were a lot of things in Defendant's vehicle that were not included on the inventory list.  Tr. at 54:4-55:22.  Officer Armstrong explained they "try to notate and mark things that are of 'extreme value' that might be stolen."  *Id.* at 54:19-20.

1868, 20 L.Ed.2d 889 (1968).  *See United States v. Stevens,* 487 F.3d 232, 244 (5th Cir.2007). Under *Terry,* the court determines the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop.  *Stevens*, 487 F.3d at 244.

Courts suppress evidence as a last resort, not a first impulse. *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). The question "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Id.* at 137. In cases where a search is not conducted pursuant to a warrant, the government bears the burden of proving that the search was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Castro*, 166 F.3d 728, 733 n.7 (5th Cir. 1999)). But "[suppression's] costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application." *Herring*, 555 U.S. at 141 (quoting *Pa. Bd. Of Probation and Parole v. Scott*, 524 U.S. 357, at 364-65 (1998)) (internal citations omitted).

## VI.  DISCUSSION

### A.    The parties' assertions

In his motion to suppress, Defendant asserts his vehicle was lawfully parked on the side of a public street and was not in violation of any parking ordinances.  Thus, there was no need to impound the vehicle.  Docket Entry # 18 at 3.  Defendant argues it is clear the officers wanted to search his vehicle because they believed he had done something illegal but did not have probable cause to initiate such a search. Defendant further asserts the officers failed to adhere to the Texarkana, Texas PD's inventory policy.

11

In its response, the Government asserts the evidence shows the officers conducted a lawful traffic stop. The Government does not argue the search of Defendant's vehicle was a valid search incident to arrest, but rather argues it was a valid inventory search pursuant to department policy. According to the Government, the officers correctly inventoried the vehicle. However, even if Defendant's allegations are considered true, the Government asserts Defendant's outstanding warrants create attenuating circumstances.

**B.    Analysis**

**1.    The traffic stop**

"[T]he level of suspicion required for an investigatory or *Terry* stop is obviously less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Where a police officer has reasonably articulable suspicion to believe that a traffic violation has occurred, an investigatory stop is justified even if the traffic offense is a minor one. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Khanalizadeh*, 493 F.3d 479, 482 (5th Cir. 2007); *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

Officer Armstrong observed Defendant make a wide turn out of a parking lot and into a center lane. This is a traffic violation under the Texas Transportation Code. TEX. TRANSP. CODE § 545.101(a) ("To make a right turn at an intersection, an operator shall make both the approach and the turn as closely as practicable to the right-hand curb or edge of the roadway."); *Wingard v. State*, No.14-11-0063, 2012 WL 3307484, *4 (Tex. App.— Houston [14th], Aug. 14, 2012, pet. ref'd) (not designated for publication) (noting that a wide turn from a parking lot into the center lane violated TEX. TRANSP. CODE § 545.101(a)). He later failed to signal within 100 feet of his left-hand turn. TEX. TRANSP. CODE § 545.104 (b) ("An operator intending to turn a vehicle right or left shall signal

12

continuously for not less than the last 100 feet of movement of the vehicle before the turn."). The stop that followed was justified.

At the hearing, Defendant's counsel focused on whether the patrol car lights were on at the time Defendant exited the vehicle, which would have put Defendant on notice the officers were attempting to detain him, suggesting the timing could change whether this was a traffic stop. When asked at the hearing if Defendant's argument is he did not have notice when he got out of the vehicle that the officers were trying to detain him, Defendant's counsel stated it is clear, based on what Defendant stated afterwards, that "he knew they had been following him, and he drove and then parked" and got out of the vehicle. Tr. at 92:19-93:3. But Defendant's counsel argued Defendant was already out of the vehicle when the lights came on. *Id.* at 93:3-4.

Officer Armstrong testified he turned the lights on and then Defendant ran. Officer Armstrong agreed with his report, which indicated "the driver exited the vehicle in a fast manner as he saw us approaching him. I activated my emergency lights on top of the patrol car, and the black male immediately began to run." *Id.* at 64:21-65:1.

In his recorded post-*Miranda* statements while in the back of the patrol car, Defendant acknowledged seeing the police lights and fleeing from the police.

> **Defendant:** . . . You didn't have no reason to pull me over if I'm out of my car. Why you messing with me if I'm outta my car? If you saw that you should've speeded up and put your lights on me then. You followed me all the way right there and **then you turned your lights on when you saw me gettin' out.** That's not right, man. Y'all know that ain't right. That's pickin', man. You been following me, man. Y'all following me down there. Y'all following me because I can't even turn because y'all tryin' to get behind me then. Y'all know y'all ain't going to win in court against me, dog.
>
> * * *
>
> **Defendant:** You stopped me while I was out on feet. You stopped me on feet, man. You didn't stop me in my car. That's what I'm trying to tell y'all.

[incomprehensible]. You didn't pull me over. You didn't pull my car over. You got it on film?

**Officer:** Okay. Take it to court, bud. Take it to court. I'll wait.

**Defendant:** I'll wait too. I ain't doing no trippin. That's a win-win for me. **You can get me for fleein[g], yeah. Cool. I'll take a fleein[g] charge all day.**

Ex. 1D (Rear Video 16:20-18:20) (emphasis added).

It is undisputed Defendant ran. By his own admission, Defendant knew the officers were following him and acknowledged they turned on their lights when they saw him getting out of his parked vehicle. When Defendant fled from the officers, he gave grounds to be arrested for evading on foot, in addition to the traffic violations earlier observed by Officer Armstrong.

The Court is unpersuaded by Defendant's counsel's suggestion at the hearing that the timing of when the overhead lights were activated could change whether this was a traffic stop justified by the officers' observations of traffic violations. As argued by the Government, parking on the side of the street does not "get you out of a traffic violation you just committed. It's not a race to see who can beat the government." Tr. at 90:18-21. According to Officer Armstrong's testimony at the hearing, even assuming the patrol car lights were not activated until after Defendant exited the vehicle, it would still be a traffic stop because Defendant was stopped for a traffic offense that he committed in that vehicle prior to parking. *Id.* at 51:8-24. According to Officer Armstrong, if he pulled up and turned on his lights and Defendant ran, he was evading detention for the traffic violations. *Id.* at 51:25-52:6. The Court agrees. Additionally, as will be discussed in more detail below, the three outstanding warrants from the State of Texas provided grounds for the arrest.

## 2.    The impound

Defendant argues the arrest did not give the officers "the ability to come back and do an impoundment and under the guise of inventory, [search] the vehicle." Tr. at 93:4-9. The

Government argues Defendant abandoned his car on a public street in order to attempt to evade detention, was arrested, and department policy mandated that officers impound (and inventory) his car.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Warrantless searches and seizures are 'per se unreasonable unless they fall within a few narrowly defined exceptions.'" *United States v. Kelly,* 302 F.3d 291, 293 (5th Cir.2002). One such exception that courts have recognized is the "community caretaking" exception. *See United States v. Castro,* 166 F.3d 728, 734 (5th Cir.1999) (en banc).

The origin of the community caretaking exception is found in the United States Supreme Court's decision in *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). *United States v. McKinnon*, 681 F.3d 203, 207–08 (5th Cir. 2012). In *Opperman,* the Court noted that impoundments by the police may be in furtherance of "public safety" or "community caretaking functions," such as removing "disabled or damaged vehicles," and "automobiles which violate parking ordinances, and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic." *McKinnon*, 681 F.3d at 208 (quoting *Opperman*, 428 U.S. at 368 (internal citation omitted)). The Court further noted the "authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *McKinnon*, 681 F.3d at 208 (quoting *Opperman*, 428 U.S. at 369).

Approximately ten years after *Opperman,* the Supreme Court "again touched on the subject of a police officer's decision to impound a vehicle in *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987)." *McKinnon*, 681 F.3d at 208. There, the Court noted "inventory

15

searches are now a well-defined exception to the warrant requirement of the Fourth Amendment."
*Bertine*, 479 U.S. at 371. Inventory searches do not invoke the policies behind the warrant requirement or the need for probable cause. *Id*. Instead, they afford necessary protections against stolen property, false claims of lost possessions, and police danger. *Id.* at 371-72 (discussing *Opperman*).

> According to the Court in *Bertine*,
>
> [n]othing in *Opperman* [ ] prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity. Here, the discretion afforded the Boulder police was exercised in light of standardized criteria, related to the feasibility and appropriateness of parking and locking a vehicle rather than impounding it.

*Id.* at 375-76.

The Fifth Circuit Court of Appeals has held on numerous occasions that impoundment of an arrestee's vehicle is permissible under the "community caretaking" exception. *United States v. Vernon*, 511 Fed. Appx. 318, 322 (5th Cir. 2013) (citing *McKinnon,* 681 F.3d at 208–09; *United States v. Staller,* 616 F.2d 1284, 1289–90 (5th Cir.1980); *United States v. Ducker,* 491 F.2d 1190, 1192 (5th Cir.1974)).  Since *Opperman* and *Bertine,* the Fifth Circuit has focused its inquiry on the reasonableness of the vehicle impoundment for a community caretaking purpose without reference to any standardized criteria.  *McKinnon*, 681 F.3d at 208.  In considering whether this exception applies, the court's constitutional analysis hinges upon the reasonableness of the "community caretaker" impound viewed in the context of the facts and circumstances encountered by the officer. *Id.* (citing *Cooper v. California,* 386 U.S. 58, 59, 87 S.Ct. 788, 17 L.Ed.2d 730 (1987) ("whether a search or seizure is unreasonable within the meaning of the Fourth Amendment depends upon the

facts and circumstances of each case.")).

The reasonableness of law enforcement's decision to impound a vehicle for "community caretaking" can also turn on whether police officers followed applicable local procedures established for impounding vehicles. *United States v. Haynes*, No. 3:17-CR-49-L, 2017 WL 3601386, at *7 (N.D. Tex. Aug. 22, 2017) (citing *United States v. Ponce*, 8 F.3d 989, 995-96 (5th Cir. 1993) (footnote omitted) ("Furthermore, Officer Nichols' decision to impound the pickup truck did not contravene the Austin Police Department procedures. The procedures authorized impoundment when '[t]he operator has been arrested and there is no responsible adult present to immediately take custody of the vehicle.'")). An officer's "ulterior motive to search" does not invalidate an otherwise-lawful impoundment executed in accordance with standard procedures established by the police department. *Haynes*, 2017 WL 3601386, at *7 (quoting *McKinnon*, 681 F.3d at 210).

According to Texarkana, Texas PD's General Orders Manual, it is the policy of the department to protect the property of persons arrested while operating a vehicle. Ex. 7 at 1. It is also the policy of the department to reduce public nuisance created by abandoned vehicles by providing the means of their removal. *Id.* The policy further provides as follows: "Officers will cause vehicles to be impounded when the driver of the vehicle is arrested," except when the person arrested chooses to release his vehicle to a licensed passenger; when the vehicle is parked at the arrested person's residence or the residence of a family member prior to arrest; the owner of the vehicle is not the person arrested but is present to take the vehicle, or this is a "non-consent" tow and requires the completion of an Impounding Vehicle Report. Ex. 7 at 3. There is no indication any of these exceptions were present.

In *Staller,* the Fifth Circuit concluded that impoundment of a car in a mall parking lot was

proper where the arrestee was from another state and had been taken to jail with little likelihood of returning to his car soon; he had no known responsible adults who could take custody of the car; and a car parked in a mall parking lot runs a high risk of vandalism or theft. 616 F.2d at 1290. These interests are present even if the defendant lawfully parked his vehicle, and they are not vitiated by an officer's suspicion that the car may contain contraband or evidence. *Id.* at 1289-90.

In this case, Defendant, the driver and sole occupant of the vehicle, had been arrested. It was likely the vehicle would be unattended for an extended period of time. Per department policy, the arresting officers caused the vehicle to be impounded. They had both the right and the duty to protect that automobile and its contents. *Id.* at 1290. Even though the vehicle was legally parked, this would not render the seizure invalid. *Franco v. Kluge*, No. EP-13-CV-00313-FM, 2015 WL 1637688, at *10 (W.D. Tex. Apr. 13, 2015) (citing *Staller*, 616 F.2d at 1290).[4]

Defendant does not appear to contend impoundment of the vehicle was improper under the department's policy because he was not operating the vehicle when arrested. Even if he was, the Court concludes any such contention would fail. *Haynes*, 2017 WL 3601386, at *7, n. 7. Although it is the policy of the department to protect the property of persons arrested while operating a vehicle, Ex. 7 at 1, the policy specifically addresses circumstances in which a vehicle may be impounded, including when "the driver of the vehicle is arrested." *Id.* at 3. This provision does not limit or address impoundment in terms of whether a person is placed under arrest *while operating the vehicle. Id.*

---

[4] Unlike in *Staller,* no one asserted in *Franco* the station was an unsafe place to park a vehicle for an extended time. 2015 WL 1637688, at *10. Even so, the court in *Franco* noted the station was open to the public and held the vehicle was inherently at risk of damage or theft. *Id.*

As noted by the court in *Haynes*, the Fifth Circuit rejected a similar argument by the defendant and dissenting judge in *Ponce*. 2017 WL 3601386, at *7, n. 7 (citing *Ponce*, 8 F.3d at 995-96). The procedure at issue in *Ponce* authorized impoundment when "[t]he operator has been arrested and there is no responsible adult present to immediately take custody of the vehicle." *Ponce*, 8 F.3d at 995. The defendant argued there was no evidence he was operating the vehicle at the time of his arrest; thus, it could not be said he was the "operator" of the truck. *Id*. at 995-96. The Fifth Circuit declined to construe the term "operator" in the extremely narrow way that the defendant's argument required. *Id.* at 996. The court noted the defendant had the keys to the truck in his pocket and told the arresting officer he drove the truck to the parole office. *Id.* According to the court, that was enough to make the defendant an operator of the truck under the police procedures at issue. *Id.*

Here, based on the facts and circumstances encountered by the officers, the Court concludes the decision to impound the vehicle driven by Defendant after his arrest was reasonable as a "community caretaker" impound and in light of Texarkana, Texas PD's policy and procedures. *See McKinnon*, 681 F.3d at 208; *Ponce*, 8 F.3d at 995-96. The Court, therefore, considers whether the inventory search of the vehicle violated the Fourth Amendment.

### 3.    The inventory

"An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Wren*, 517 U.S. at 812, n. 1. However, an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. *Florida v. Wells*, 495 U.S. 1, 4 (1990).

Defendant asserts the officers failed to adhere to the Texarkana, Texas PD's inventory policy.

19

Docket Entry # 18 at 3. Defendant argues "the entire exercise was a ruse to rummage through [Defendant's] vehicle for evidence of some crime." *Id.* Defendant points out Officer Armstrong believed Defendant may have been in possession of narcotics and Officer Johnson was excited to search Defendant's vehicle. Tr. at 56:2-4; *see also id.* at 86:13-20. According to Defendant's counsel, "the whole inventory and impoundment was a ruse to get into his vehicle." *Id.* at 93:13-94:3.

The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime." *Wells*, 495 U.S. at 4 (quoting *Bertine,* 479 U.S. at 376). However, "in forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion." *Wells*, 495 U.S. at 4.

According to the Fifth Circuit, "an inventory search of a seized vehicle is reasonable and not violative of the Fourth Amendment if it is conducted pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." *McKinnon*, 681 F.3d at 209 (citing *United States v. Lage,* 183 F.3d 374, 380 (5th cir. 1999) (citing *United States v. Hope,* 102 F.3d 114, 116 (5th Cir.1996))). These standardized regulations and procedures must "sufficiently limit the discretion of law enforcement officers to prevent inventory searches from becoming evidentiary searches." *McKinnon*, 681 F.3d at 209-10 (quoting *United States v. Andrews,* 22 F.3d 1328, 1336 (5th Cir.1994) (citation omitted)).

The inventory in this case was conducted pursuant to standardized procedures that are

consistent with protecting the property of the vehicle's owner and protecting the police against claims or disputes over lost or stolen property. *McKinnon*, 681 F.3d at 209. These standardized regulations and procedures sufficiently limit the discretion of law enforcement officers to prevent inventory searches from becoming evidentiary searches. *Id*. at 209-10.

Texarkana, Texas PD's inventory policy provides as follows:

N.    INVENTORY OF PROPERTY WHEN IMPOUNDING VEHICLES

1. An inventory is an administrative process by which items of property in an impounded vehicle are listed and secured. An inventory is not a search and is not used as a substitute for a search.

2. It is the responsibility of officers impounding vehicles to:

   a. Thoroughly inspect and inventory the affected vehicle's exterior and interior that includes the passenger and trunk areas of automobiles and the passenger and bed areas of trucks (whether the bed is enclosed or open) for all property, personal and otherwise, in an effort to properly provide for the safekeeping of all impounded property and to assure the liability of damaged and/or lost property to the responsible party.

   b. Inventory the contents of articles such as briefcases, boxes and other containers that are not secured by locks or by other devices that would cause damage if opened.

3. Once an inventory is made of the contents of any container, it is the responsibility of the officer to properly secure the container so that no damage or loss occurs resulting from the inventory.

4. If a vehicle to be impounded is locked, the officer should make a reasonable effort to gain entry to the vehicle without damaging the vehicle. If he cannot enter the vehicle without damaging it, the officer will leave the vehicle locked and will not inventory the property. The officer notes such on the Impounded Vehicle Report and in his/her incident report.

5. The ignition keys to impounded vehicles will remain with the vehicle at the vehicle storage facility, and the remainder of the keys will be placed in the prisoner's property or placed into Property and Evidence.

6. An officer shall place any property of great value located in a vehicle into Property and Evidence.

7. If during the inventory of a vehicle's contents, it happens that an officer locates articles considered contraband or evidence connected with the commission of an offense, the officer shall place the articles into Property and Evidence.

Ex. 7 at 9.

Defendant argues the inventory was not executed in good faith or in compliance with the policy. According to Defendant, the officers wanted to stop and search Defendant or his vehicle, and "they were going to find a way to do it." Tr. at 91:20-92:1. As a preliminary matter, the Court notes the officers had the right to stop Defendant for the observed traffic violations, even if the traffic stop

may have been pretextual. *United States v. Castaneda*, 273 F.3d 1094, n.1, 2001 WL 1085086 (5th Cir. 2001) (unpublished opinion)[5] (citing *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (allowing an officer to make a pretextual stop as long as he or she has probable cause to believe that a traffic violation has occurred)).

In *Castaneda*, the defendant argued what he characterized as an inventory search was invalid because the traffic stop leading to his arrest was pretextual.   2001 WL 1085086, at *2.  The Fifth Circuit found the defendant's reliance on *Florida v. Wells* inapposite, noting the Supreme Court in *Wells* held the inventory search itself cannot be pretextual.  *Id.* (citing 495 U.S. at 3).   According to the court in *Castaneda*, although the traffic stop was admittedly pretextual, "the police officers in good-faith relied on an arrest warrant to arrest Castaneda."  2001 WL 1085086, at *2. The court held the ensuing search was "not pretextual and was valid." *Id.*

Here, the Court does not find the traffic stop was pretextual.  However, even if it was, the police officers in good faith relied on the outstanding warrants to arrest Defendant.

The Court finds no support for Defendant's argument the inventory procedure used in this case was merely a pretext for an investigatory search for evidence.  *Staller*, 616 F.2d at 1290.  There was no showing the officers, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation. In *Staller*, the Fifth Circuit recognized the officers who had just arrested appellants for passing counterfeit bills may have suspected that other incriminating evidence

---

[5] In *Castaneda*, the Drug Enforcement Agency ("DEA") put Castaneda under surveillance, suspecting he had drugs in his possession. 2001 WL 1085086, at *1. The DEA agents witnessed Castaneda exit out of a house with a gray shopping bag and drive away in his pickup truck. While following the pickup truck, the DEA agents noticed a minor in Castaneda's car was not wearing a seatbelt. They requested patrol officers from the Forth Worth Police Department to stop Castaneda's car. "During this admittedly pretextual traffic stop, the patrol officers learned that he had an outstanding arrest warrant, and subsequently arrested him."  *Id.*

was present in the car. *Id.* However, according to the court, "if an inventory search is otherwise reasonable, its validity is not vitiated by a police officer's suspicion that contraband or other evidence may be found." *Id*. (quoting *United States v. Prescott*, 599 F.2d 103, 106 (5th Cir. 1979); *United States v. Hall*, 565 F.2d 917 (5th Cir. 1977)).

In *McKinnon*, officers stopped the defendant for displaying an expired registration sticker and later arrested the defendant when he failed to produce a driver's license. 681 F.3d at 204. The officers inventoried the defendant's car pursuant to department policy. *Id*. At the time, the defendant's vehicle was parked on a public street. *Id*. at 208. The defendant complained the search was unconstitutional and pretextual because his car was lawfully parked and the arresting officer admittedly suspected that the car housed evidence of a separate crime. *Id*. at 206-07. The Fifth Circuit found the impound was reasonable given the department's impound policy and held the officer's subjective motive did not negate the search's constitutionality. *Id*. at 209-10. Similarly here, the Court finds the officers' subjective motive does not negate the constitutionality of the inventory of Defendant's vehicle.

Finally, the Court addresses the sufficiency of the inventory. The department's policy provides the officers shall thoroughly inspect and inventory the affected vehicle's exterior and interior and inventory the contents. Ex. 7 at 9. According to the Government, Officer Weaver's dashboard and body cameras captured the images of officers searching the exterior, interior, passenger, and trunk areas of Defendant's vehicle. After locating the drugs and weapon, officers proceeded to secure the contraband and deliver it into Property and Evidence. Ex. 1H (Weaver Body Cam at 25:38-27:38). In addition to the video inventory recorded on officer body cameras, officers created a written record of the contents of Defendant's vehicle as required by the policy. The

23

Inventory Report lists the following: "MISC CLOTHING," "COMPUTER," BROKEN DRONE," and "MISC PAPERS."   Ex. 14.

At the hearing, Defendant's counsel pointed out Officer Armstrong acknowledged at the hearing that listing "miscellaneous clothing or miscellaneous papers" on the inventory was not complete or accurate. Tr. at 55:12-22. Defendant's counsel further argued the arresting officer did not conduct the inventory.  Instead, it was conducted by an officer in training.  *Id.* at 94:8-18.

In *United States v. Shaw,* the Fifth Circuit upheld a vehicle inventory search despite officers' failure to include an iPad and seven rounds of ammunition on the inventory search worksheet, use of the wrong officer's name on the impound sheet, and conducting of two separate inventory searches, finding that "any deviations from standard operating procedure were arguable and minor." 578 Fed. Appx. 363, 366 (5th Cir.2014) (designated unpublished); *see also United States v. Hockenberry,* 730 F.3d 645, 660–61 (6th Cir.2013) (affirming district court's denial of motion to suppress, even though "officers did not inventory all items within the vehicle . . . despite the policy instruction to list all items of value"); *United States v. Peterson,* 2011 WL 1485401, *4 (N.D. Tex. Apr.19, 2011) (denying motion to suppress firearm, finding the officer's "failure to note the seizure of the firearm on the impoundment form did not transform a constitutionally permissible inventory search into a Fourth Amendment violation").

Based on the totality of the circumstances, from the dashboard and body camera videos, the exhibits and hearing testimony, and applicable Supreme Court and Fifth Circuit case law, the Court finds the inventory search was reasonable and remained within the parameters of the inventory search exception under the Fourth Amendment. Defendant does not establish a violation of his Fourth Amendment rights because the officers conducted a reasonable inventory search to protect

the contents of Defendant's vehicle prior to impoundment. *See Ferguson v. Dunn*, No. 1:16-CV-00272-MAC, 2019 WL 456264, at *5 (E.D. Tex. Jan. 10, 2019), *report and recommendation adopted*, No. 1:16-CV-00272-MAC, 2019 WL 452746 (E.D. Tex. Feb. 1, 2019).

**4.    The outstanding warrants**

As noted above, the Government asserts the three outstanding Class C warrants Defendant had at the time of his arrest is dispositive of Defendant's motion, even if the Court were to consider all of Defendant's allegations as true. Docket Entry # 21 at 11-14. According to the Government, discovery of a valid arrest warrant is a sufficient intervening event under the attenuation doctrine. *Utah v. Strieff*, 136 S.Ct. 2056, 2063 (2016).

The exclusionary rule, which requires trial courts to exclude unlawfully seized evidence in a criminal trial, encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later discovered and found to be derivative of an illegality," the so-called "'fruit of the poisonous tree.'" *Id.* at 1261 (quoting *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)). There are several exceptions to the rule, including the independent source doctrine, the inevitable discovery doctrine, and at issue here, the attenuation doctrine.  *Strieff*, 136 S.Ct. at 1261.

Under the attenuation doctrine, improperly gathered evidence is admissible when the connection between the unconstitutional conduct and the seizure of the evidence is remote or interrupted by some intervening circumstance. *Id*. Three factors guide the analysis: (1) the temporal proximity between the unconstitutional conduct and the seizure; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id*. at 2062.

Although the first factor, temporal proximity between the stop and search, weighs against a

finding of attenuation, *id.*, "temporal proximity is not dispositive and is typically the least determinative factor involved." *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018) (finding sufficient attenuation even where the lower court failed to consider the temporal proximity factor) (internal citation and quotations omitted). As in *Strieff*, the second and third factors favor the Government.

Under the second factor, the presence of intervening circumstances, the Supreme Court in *Strieff* held the discovery of a valid arrest warrant unconnected with the stop "strongly favor[ed]" a finding of attenuation. 136 S.Ct. at 2062. "A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." *Id.* (internal citations and quotations omitted). It is undisputed Defendant had three valid arrest warrants that pre-dated the investigation and were unconnected to the stop. Ex. 15. His arrest "was thus a ministerial act that was independently compelled by the pre-existing warrant[s]."[6] *Strieff*, 136 S.Ct. at 2063.

In *Strieff*, the Supreme Court emphasized the third factor, the purpose and flagrancy of the official misconduct, is particularly important and again found it strongly favored the government. 136 S.Ct. at 2062-63. The Court noted the officer made two "good-faith mistakes" and was at most negligent.[7] *Id.* at 2063.

___

[6] In addition, Defendant was driving without a license, an arrestable offense in Texas.

[7] In *Strieff*, officers began surveillance on a third party's house after receiving an anonymous tip about drug activity. 136 S.Ct. at 2059. They observed a high volume of visitors staying for short spurts of time. *Id.* Eventually, an officer stopped a visitor who exited the house and walked to a nearby parking lot. *Id.* at 2060. The officer did not know how long the defendant was in the house, and the government conceded that this stop lacked probable cause. *Id.* at 2060, 2063. But when the officer ran the defendant's information, dispatch returned an outstanding warrant for a traffic violation. *Id.* at 2060. The officer arrested the defendant pursuant to the warrant and searched him incident to arrest, yielding a bag of methamphetamine. *Id.* The Supreme Court held the officer's conduct was negligent at best, noting there was no indication the unlawful stop was part of

Defendant asserts the impoundment and inventory procedures were not executed in good faith. However, Defendant has not identified flagrant police misconduct in satisfaction of the third attenuation factor. "Misconduct is not 'flagrant' just because officers violated the Fourth Amendment." *Mendez*, 885 F.3d at 913. The violation must be more severe than "the mere absence of proper cause for the seizure." *Id*. Here, Defendant's allegations, even if taken as true, fail to establish a Fourth Amendment violation, much less a flagrant one. Defendant committed a series of violations that justified his detention and arrest, including numerous traffic violations, driving without a license, and fleeing from the police. Officers did not "flagrantly violate" Defendant's rights by detaining and arresting him.

## VII.  RECOMMENDATION

Based on the foregoing analysis, it is hereby

**RECOMMENDED** that Defendant's Motion to Suppress (Docket Entry # 18) be **DENIED**.

### Objections

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United States Auto Ass'n.*, 79

---

systematic or recurrent police misconduct. *Id*. at 2063.

F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 24th day of April, 2019.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE